THE CITY OF ROCHESTER, Plaintiff, *v.* LEWIS M. THURSTON, Defendant.

City Court of Rochester, Criminal Branch, December 8, 1939.

*Daniel J. O'Mara, District Attorney [Thomas P. Culhane, Assistant District Attorney,* of counsel], for the plaintiff.

*Maurice Kaman,* for the defendant.

TOMPKINS, J. The defendant is charged with a violation of section 620 of the Penal Ordinances of the city of Rochester, in that he on October 9, 1939, being the owner of an English bull dog of " dangerous disposition " did suffer it to run at large.

The defendant with his wife and child reside on Main Street East, next door to Doctor Leve, a witness for the prosecution. The English bull in trim condition tips the scales at three stone. Doctor Leve owns a dog he describes as a " mongrel," a scant half the size of the bull. The dogs run at large. No fence separates their respective domains. Neither was content to remain peacefully on his side of this unfenced democratic boundary. Encounters were frequent, and vociferous while they lasted. The dogs' antipathies extended to their masters — with but verbal manifestations, however.

On May twenty-first, at about nine P. M., Doctor Leve went out his back door accompanied by his " mongrel " on a leash, ostensibly to close his garage door. The bull had just returned home with the family. On discovering the " mongrel " outside at that unseemly hour, and evidently unconscious of the master's presence, he promptly charged over the border at the unsuspecting " mongrel." Doctor Leve, seeing the forty-two pounds of unleashed fury hurling itself upon them, unhesitatingly gathered his pet into his arms, and intrepidly interposed himself as a defensive bulwark. The bull, foiled of his prey, vented his rising spleen on the presumptuous, protecting doctor. A woefully shredded smoking jacket and a pair of sadly mutilated trousers, together with a number of ugly scars on the doctor's arm and leg bear mute but eloquent witness to the dire effects of his temerity and the success of the attack.

On October ninth last the bull again invaded his enemy's domain. The mongrel, unsuccessful in meeting the invasion, sought safety in his master's kitchen. The friendly door opened, but before it could be closed, the bull intruded into what the " mongrel " had supposed was his castle. Wise by experience, he quickly found seclusion beneath a friendly Morris chair in the dining room. The bull, seeing red and foiled of his prey, lost all sense of proper discrimination, and ruthlessly sprang upon the maid, a slight girl of

twenty-five, who was then preparing the evening meal. In his blind rage he respected neither age nor sex. She was severely bitten not once, but several times.

The defendant moves to dismiss the information upon two grounds: *First,* that the prosecution did not establish that the bull dog was of a " dangerous disposition," and *second,* that the defendant was not shown to be the owner of the dog.

The defendant urges in support of the first ground for his motion that the language of the ordinance referring to a dog of " dangerous disposition " implies danger solely to persons; and that it appeared from the testimony that the bull dog was shown to have attacked persons only as a mere incident to his murderous onslaught on a fellow dog. This is substantially true. The words " dangerous disposition " as used in the ordinance are unqualified. We may, however, assume that danger to persons, especially to children, was in the minds of the framers of this ordinance, perhaps uppermost, but not to the exclusion of danger to other animals rightfully and peaceably on the public streets. Surely we may not say that a dog with a penchant for attacking on sight defenseless horses attached to vehicles on the highway, or other dogs peaceably inclined, may politely be said to be harmlessly innocuous, and, therefore, lawfully entitled to roam at large, so long as he vents his spleen on his kind. We do not, however, overlook that the provocativeness of a small dog may well be of inverse ratio to its size.

But even should we so construe the ordinance, it would be only on condition that dogs of such litigious disposition confine to the letter their attacks to animals of the lower orders. When the blood-lust is on them, if they cannot discriminate between an enemy dog and its master, or when they pursue it into its master's castle and there, foiled of their prey, ruthlessly mutilate an innocent bystander, no feeling of admiration for man's " noblest friend " will permit us to withhold the brand of " vicious " and " dangerous " from such a dog that so disgraces all that is decent and fine in dogdom. This dog in question was unqualifiedly vicious and dangerous. It should not run at large.

The defendant's second ground for dismissing the charge is that he is not the owner of the dog, and, therefore, is not liable for the dog's " running at large." To support this *in extremis* defense the defendant ungallantly, yet with ancient but wholly unadmirable precedent therefor (Genesis, chap. III, v. 12), produced a dog license issued to his wife and testified it was the " woman " who owned the dog.

Subdivision 1 of the ordinance provides: " A person must not suffer or permit to run at large any dog of dangerous disposition."

To permit implies power to legally prevent. Power to prevent predicates legal dominion. Legal dominion is an adjunct to ownership. Defendant's wife is the owner. She, not her husband, may exercise dominion over her pet bull dog. While he, as father of their children, may exercise joint control over such offspring, his authority does not extend to control over or responsibility for the dog licensed in his wife's name, any more than it would be to the automobile owned by her and licensed in her name. She may loan her car to her husband, who, while operating it, thereby becomes responsible for its proper use; likewise she may graciously permit her husband to exercise on a Sunday morning her dog on a leash; and while so exercising he may become responsible for the fruit of its forays should he, with a fellow feeling for the restraint, sympathetically but unwisely, unleash it. There is no proof here of such acquired dominion.

The learned district attorney, with an unwarranted confidence, sought to show by direct questions that the defendant husband was the " head of the house." Time was that such was the fact. Today marriage creates a democracy — not a dictatorship. True, marriage is a partnership; but the dog was neither a partnership asset nor liability. Time was when the lord and master was responsible for his wife's torts. That pleasant, although sometimes embarrassing arrangement, has long since been relegated to the ashheap of outmoded and discarded relics of man's once vaunted superiority. Today, while the husband still must support his wife in accordance with his means (Code Crim. Proc. § 899, subd. 1; *People* v. *Goodwin*, 167 Misc. 627); while he is still primarily responsible for their children's support (*Young* v. *Valentine*, 177 N. Y. 347, 352), he is under no obligation to support her dog. It is not a necessity; neither as a guardian while she remains under her husband's roof, nor as a substitute for children, while the marriage relation continues. Not liable for its support, he is not responsible for its reversion to the wolfish traits of its ancestors. That this construction was intended by the makers of the ordinance appears from subdivision 4 thereof. This subdivision provides that upon a second conviction, the dog, not the owner, may be sentenced to immediate and ignominious death at the hands of the keeper of the dog pound. It provides further that " any owner or keeper of any such dog who refuses to deliver up the same " for execution is liable " to additional fine therefor." This shows beyond peradventure that it is " the owner or keeper " who is liable in the first instance; that is, as already stated, he who has legal dominion. The defendant was neither owner nor keeper — merely the husband of the dog's mistress.

It may be noted in passing that while the owner of the dangerous dog is liable by section 795 of the Penal Ordinances to imprisonment for 150 days, plus a fine of $150, yet the dog on its owner's first conviction, no matter how seriously it may have mangled an innocent child, is immune to the court's mandate. Apparently approving the old but inaccurate saying that " every dog is entitled to its first bite," the ordinance is more tender of the dog than of its master.

The prosecution having failed to establish either ownership in the defendant or his legal dominion over the dog, the motion to dismiss the information must be granted.